Hyosung USA, Inc. v. Travelers Prop. Cas. Co. of Am., 2021 NCBC 81.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

HYOSUNG USA, INC.,

          Plaintiff,

v.

TRAVELERS PROPERTY
CASUALTY COMPANY OF
AMERICA; HARTFORD FIRE
INSURANCE COMPANY; and USI
INSURANCE SERVICES, LLC,

          Defendants,

and

LOGIPIA USA, INC.,

          Defendant and
          Third-Party
          Plaintiff,

v.

DUKE REALTY LIMITED
PARTNERSHIP,

          Third-Party
          Defendant.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
19 CVS 23974

**ORDER AND OPINION ON
PLAINTIFF HYOSUNG USA INC.'S
FIRST AND SECOND MOTIONS FOR
PARTIAL SUMMARY JUDGMENT
AGAINST DEFENDANTS
TRAVELERS PROPERTY CASUALTY
COMPANY OF AMERICA AND
HARTFORD FIRE INSURANCE
COMPANY**

1. **THIS MATTER** is before the Court on Plaintiff Hyosung USA, Inc.'s, ("Hyosung") Partial Motion for Summary Judgment (the "First Motion") against Defendants Travelers Property Casualty Company of America ("Travelers") and Hartford Fire Insurance Company ("Hartford"; collectively, the "Parties") filed on 2 February 2021, (ECF No. 81), and Hyosung's Second Partial Motion for Summary Judgment (the "Second Motion"; together, the "Motions") against Travelers filed on 16 March 2021, (ECF No. 92).

2.    Hyosung brings this action against (i) its insurers, Defendants Travelers and Hartford, (ii) its insurance broker, USI Insurance Services, LLC ("USI"), and (iii) its warehouse services provider, Logipia USA, Inc., ("Logipia"), seeking insurance coverage, reimbursement, and damages for Hyosung's losses relating to damage to certain Hyosung products (the "Products") that Logipia stored for Hyosung at Third-Party Defendant Duke Realty Limited Partnership's ("Duke Realty") warehouse (the "Warehouse") in Savannah, Georgia.  (Compl., ECF No. 2.)

3.    Hyosung's Motions seek summary judgment establishing its preferred interpretation of certain terms of an insurance policy issued to Hyosung by Travelers. The First Motion seeks a declaration that an insurance policy Hartford issued to Logipia is not "other insurance" under the Travelers policy, and the Second Motion seeks a declaration that the events at issue in this action constituted a single occurrence to which a single "windstorm" deductible applies.

4.    Having considered the Motions, the related briefing, appropriate matters of record, and the arguments of counsel at the hearing on the Motions, the Court, in the exercise of its discretion and for the reasons set forth below **GRANTS** both Motions and enters judgment for Hyosung as provided herein.

*Bray & Long, PLLC, by Jeffrey A. Long, and Thompson Hine LLP, by Christopher M. Bechhold, for Plaintiff Hyosung USA, Inc.*

*Womble Bond Dickinson (US) LLP, by James A. Dean[1] and Ryan H. Niland, and Niles, Barton & Wilmer, LLP, by Bryant Green and Craig D. Roswell, for Defendant Travelers Property Casualty Company of America.*

---

[1] By order dated June 23, 2021, the Court permitted Mr. Dean to withdraw, and to substitute Mr. Niland, as counsel for Defendant Travelers Property Casualty Company of America in this action.  (ECF No. 116.)

*Butler Weihmuller Katz Craig LLP, by Andrew L. Watson and Eric R. Noble, for Defendant Hartford Insurance Company.*

*Bradley Arant Boult Cummings LLP, by Christopher C. Lam and Dexter Hobbs, and Saul Ewing Arnstein & Lehr, LLP, by Kyra Smerkanich and Edward Baines, for Defendant USI Insurance Services, LLC.*

*Hedrick Gardner Kincheloe & Garofalo LLP, by David L. Levy and Kristy M. D'Ambrosio, for Defendant and Third-Party Plaintiff Logipia USA, Inc.*

*Parker Poe Adams & Bernstein LLP, by John C. Amabile, Eric A. Frick, and A. Todd Sprinkle, for Third-Party Defendant Duke Realty Limited Partnership.*

Bledsoe, Chief Judge.

I.

FACTUAL AND PROCEDURAL BACKGROUND

5. "The Court does not make findings of fact on motions for summary judgment; rather, the Court summarizes material facts it considers to be uncontested." *McGuire v. Lord Corp.*, 2021 NCBC LEXIS 4, at *3 (N.C. Super. Ct. Jan. 19, 2021).

6. In 2018, Hyosung entered a services agreement (the "Services Agreement") with Logipia obligating Logipia to provide warehouse space and transportation services for Hyosung's Products, including "Tire Cord Pet Yarn, Steel Tire Cord and Fabric" worth approximately $31 million. (Aff. Veronica Li, Esq. ¶ 2 [hereinafter "1st Li Aff."], ECF No. 82; 1st Li. Aff. Ex. 1 [hereinafter "Services Agreement"], ECF No.

82.1; Aff. Veronica Li, Esq. ¶ 2 [hereinafter "2nd Li Aff."], ECF No. 93.)[2] The Services Agreement further required Logipia to maintain a "warehouseman's legal liability insurance policy," but allowed Hyosung to maintain its own "property insurance on its inventory[.]" (Services Agreement 3.)

7.      As required by the Services Agreement, Logipia purchased third-party liability insurance through Hartford in 2019 (the "Hartford Policy"). (1st Li Aff. Ex. 3 [hereinafter "Hartford Policy"], ECF No. 82.3.)[3] This policy was in effect at the time Hyosung's Products were damaged. (Hartford Policy 4.) Some of the Hartford Policy's provisions are relevant to the determination of the First Motion, including the following provision relating to coverage:

> **A. COVERAGE**
> **1. Covered Property**, as used in this Coverage Form, means tangible property of others which you have accepted as a warehouse operator or bailee.
> **a. Scheduled Premises**
> We will pay those sums you become legally obligated to pay as damages for direct physical "loss" caused by a Covered Cause of Loss to Covered Property while located at the "Premises" described in the Declarations or Schedule, for which a limit of Insurance is shown.

(Hartford Policy 18.)

8.      Around the same time, Hyosung obtained a first-party property insurance policy with Travelers (the "Travelers Policy"), which provided coverage for injury to

---

[2] Li is Hyosung's General Counsel and submitted an affidavit with attached exhibits for each Motion, (ECF Nos. 82 & 93). As noted, ECF No. 82 will be referred to as "1st Li Aff."; ECF No. 93 will be referred to as "2nd Li Aff.".

[3] The specific policy Logipia purchased from Hartford was Hartford Commercial Inland Marine Policy 72MSHB9012K2. (Hartford Policy 4.)

Hyosung's Products. (1st Li Aff. Ex. 2 [hereinafter "Travelers Policy"], ECF No. 82.2.)[4] Several provisions of the Travelers Policy are relevant to the determination of the Motions.

9. First, as to coverage, the Travelers Policy states in relevant part as follows:

> **A. COVERAGE**
> The Company will pay for direct physical loss or damage to Covered Property caused by or resulting from a Covered Cause of Loss. Covered Causes of Loss means risk of direct physical loss unless the loss is excluded in Section D., Exclusions, Limited in Section E., Limitations, or otherwise extended, excluded or limited in this Coverage Form, the Supplemental Coverage Declarations or by endorsement.

(Travelers Policy 11.)

10. Next, the Travelers Policy contains an "other insurance" provision ("Other Insurance"), which states, in relevant part:

> **17. Other Insurance**
> . . .
> If there is other insurance covering the same loss or damage, other than that described above, the Company [Travelers] will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether the Insured can collect on it or not. But, the Company will not Pay more than the applicable Limit of Insurance.

(Travelers Policy 36–37.)

11. Finally, the Travelers Policy contains a specific deductible in the event of a loss caused by a "Windstorm" (the "Windstorm Deductible"):

> **3. Application of Deductibles and Limits of Insurance – "Windstorm" or Hail Additional Provisions**
> a. When a "Windstorm" or Hail Limit of Insurance (including an entry of Included or Not Covered) or a "Windstorm" or Hail

---

[4] The specific policy Hyosung purchased from Travelers was Travelers Commercial Property Policy KTJ-CMB-4N07012-4-19. (Travelers Policy 2.) Citations to the page numbers of the Hartford and Travelers Policies refer to the electronic PDF page numbers and not the numbers printed on the pages themselves.

> deductible is shown in the Supplemental Coverage Declarations, such Limit of Insurance or deductible will apply to all loss or damage in any one occurrence:
>
> > (1) Caused directly or indirectly by "Windstorm" or Hail that occurs at the locations to which the "Windstorm" or Hail Limit of Insurance or deductible applies, regardless of any other cause or event that contributes concurrently or in any sequence to the loss or damage;

(Travelers Policy 33.) The Policy defines a "Windstorm" as "a storm with wind or wind gusts, with or without, and regardless of the amount of, precipitation."

(Travelers Policy 47.)

12. On or about 19 April 2019, a Windstorm removed large portions of the Warehouse's roof, allowing water to enter the Warehouse and damage and/or destroy Hyosung Products stored there ("Incident 1"). (1st Li Aff. ¶ 3.) At Duke Realty's direction, items inside the Warehouse were pushed away from the areas beneath the damaged portions of the roof and plastic sheeting was hung from the ceiling as a temporary repair to prevent additional damage to Hyosung's Products. (1st Li Aff. ¶ 4.) In the meantime, vast sections of the roof remained missing. (*See* 1st Li Aff. ¶ 3.) A week later, on 26 April 2019, the plastic sheeting failed and allegedly activated the Warehouse's sprinkler system, causing further water damage to Hyosung's Products ("Incident 2"; together, with Incident 1, the "Incidents"). (1st Li Aff. ¶ 4.) There is also evidence that it rained on April 26, causing further water damage to Hyosung's Products. (Def. Travelers Br. Opp'n Pl. Hyosung's 2nd Mot. Partial Summ. J. Against Travelers [hereinafter "Travelers' Opp'n 2nd Mot."] Ex. 3, ECF No. 103.3.)

13. It is undisputed that, under the Travelers Policy, the damaged and destroyed Products are "covered property" and that the damage and destruction to those Products resulted from a covered "cause of loss." (Br. Supp. Hyosung's Mot. Partial Summ. J. Against Defs. Travelers and Hartford 4 [hereinafter "Hyosung's Supp. 1st Mot."], ECF No. 83.) The parties also agree that a Windstorm Deductible applies to Incident 1. (Br. Supp. Pl. Hyosung's 2nd Mot. Partial Summ. J. Against Def. Travelers 7 [hereinafter "Hyosung's Supp. 2nd Mot."], ECF No. 94.)

14. Following the Incidents, Hyosung sought reimbursement from Logipia pursuant to the Services Agreement, but Logipia refused to pay. (1st Li Aff. ¶ 7.) Hyosung also submitted a claim to Travelers for reimbursement under the Travelers Policy. (1st Li Aff. ¶¶ 8–9.) Travelers refused to reimburse Hyosung fully for the loss, however, asserting through two separate letters that (i) Travelers had no duty to indemnify Hyosung for the first $2 million of loss for each Incident because the Other Insurance provision in the Travelers Policy required Hyosung to recover those sums from Hartford under the Hartford Policy and (ii) each Incident was a separate "occurrence" caused by a Windstorm under the Policy, subjecting Hyosung's claims to a Windstorm Deductible of $1.55 million for each Incident. (1st Li Aff. Ex. 4, ECF No. 82.4; 1st Li Aff. Ex. 5, ECF No. 82.5.)

15. Hyosung could not resolve its dispute with Logipia, Travelers, and Hartford and filed this action on 30 December 2019 against those entities and USI (collectively, "Defendants"), asserting causes of action arising out of the Incidents for breach of contract, declaratory judgment, and negligence. (Compl. ¶ 23–44.)

16. Shortly before the close of discovery on 22 March 2021, (Case Management Order 5, ECF No. 37), Hyosung filed its First Motion on 4 February 2021 and its Second Motion on 16 March 2021.

17. In its First Motion, Hyosung argues that the Hartford Policy is not Other Insurance under the Travelers Policy. (Hyosung's Supp. 1st Mot. 6–9.) Hartford joins Hyosung's First Motion and seeks (i) a declaration that Travelers is obligated to respond to Hyosung's property damage claim under the Travelers Policy, not the Hartford Policy and (ii) the dismissal of Hyosung's claims against Hartford because the Hartford Policy provides liability insurance, not coverage for property damage like Hyosung has suffered here. (Hartford's Resp. and Joinder with Pl.'s Mot. Partial Summ. J. 4–7 [hereinafter "Hartford's Resp. 1st Mot."], ECF No. 86.)

18. In its Second Motion, Hyosung argues that the Incidents comprise a single "occurrence" subject to a single Windstorm Deductible under the Travelers Policy or, in the alternative, that Incident 2 was an "occurrence" separate from Incident 1 that was not caused directly or indirectly by a Windstorm, subjecting Hyosung's claim to a deductible of $100,000 rather than $1.55 million. (Hyosung's Supp. 2nd Mot. 7–11.)

19. The Parties have stipulated that the Travelers Policy is governed by North Carolina law and that the Hartford Policy is governed by Georgia Law. (Joint Stipulation for Choice of Law – Insurance Policies, ECF No. 42.)

20. After full briefing, the Court conducted a hearing on the Motions on 4 June 2021, at which all parties were represented by counsel. The Motions are now ripe for resolution.

## II.

## LEGAL STANDARD

21. Pursuant to N.C. R. Civ. P. 56(c), a party is entitled to summary judgment when the record shows that "there is no genuine issue as to any material fact and that [the movant] is entitled to judgment as a matter of law." *Forbis v. Neal*, 361 N.C. 519, 524 (2007) (quoting N.C. R. Civ. P. 56(c)). While a trial court considering a motion for summary judgment must view the evidence presented in the light most favorable to the nonmoving party, "[i]f the movant demonstrates the absence of a genuine issue of material fact, the burden shifts to the nonmovant to present specific facts which establish the presence of a genuine factual dispute for trial." *In re Will of Jones*, 362 N.C. 569, 573 (2008); *see also Lowe v. Bradford*, 305 N.C. 366, 369–71 (1982) (recognizing that the burden shifted to the nonmovant to present contrary facts when the movant submitted supporting affidavits).

22. In considering the Motions, it bears emphasizing that "[a]n insurance policy is a contract and its provisions govern the rights and duties of the parties thereto." *C. D. Spangler Constr. Co. v. Indus. Crankshaft & Eng'g Co.*, 326 N.C. 133, 142 (1990).[5] "[D]etermining the meaning of language in an insurance policy presents a question of law for the Court." *Accardi v. Hartford Underwriters Ins. Co.*, 373 N.C. 292, 295 (2020). "When interpreting an insurance policy, courts apply general contract interpretation rules." *Id.* "As in other contracts, the objective of construction

---

[5] The Court notes that the Motions do not require the Court to interpret the Hartford Policy, only the Travelers Policy. Because the Travelers Policy is governed by North Carolina law, the Court therefore recites only North Carolina legal principles relevant to the interpretation of the Travelers Policy.

of terms in an insurance policy is to arrive at the insurance coverage intended by the parties when the policy was issued." *Wachovia Bank & Tr. Co. v. Westchester Fire Ins. Co.*, 276 N.C. 348, 354 (1970). "The various terms of the policy are to be harmoniously construed, and if possible, every word and every provision is to be given effect." *Woods v. Nationwide Mut. Ins. Co.*, 295 N.C. 500, 506 (1978); *see also Harleysville Mut. Ins. Co. v. Buzz Off Insect Shield, L.L.C.*, 364 N.C. 1, 9 (2010) ("We construe all clauses of an insurance policy together, if possible, so as to bring them into harmony." (citation and internal quotation marks omitted)). "[W]herever possible, the policy will be interpreted in a manner which gives, but never takes away, coverage." *Wash. Hous. Auth. v. N.C. Hous. Auths. Risk Retention Pool*, 130 N.C. App. 279, 281 (1998) (citation and internal quotation marks omitted).

23. Further, "a contract of insurance should be given that construction which a reasonable person in the position of the insured would have understood it to mean[.]" *Grant v. Emmco Ins. Co.*, 295 N.C. 39, 43 (1978). If the policy contains a defined term, "the court applies that meaning unless the context requires otherwise. However, if the policy fails to define a term, the court must define the term in a manner that is consistent with the context in which the term is used, and the meaning accorded to it in ordinary speech." *Accardi*, 373 N.C. at 295.

24. In addition, North Carolina courts have long held that "any ambiguity or uncertainty as to the words used in the policy should be construed against the insurance company and in favor of the policyholder or beneficiary. If a court finds that no ambiguity exists, however, the court must construe the document according

to its terms." *Id.* At the end of the day, "the intention of the parties as gathered from the language used in the policy is the polar star that must guide the courts[.]" *Cowell v. Gaston Cnty.*, 190 N.C. App. 743, 746 (2008) (quoting *McDowell Motor Co. v. N.Y. Underwriters Ins. Co.*, 233 N.C. 251, 253 (1951)) (cleaned up).

## III.

## ANALYSIS

### A.    Hyosung's First Motion for Partial Summary Judgment

#### 1.    Is the Hartford Policy "Other Insurance" Under the Travelers Policy?

25.    The issue raised by the First Motion is whether, on this record, the Other Insurance provision in the Travelers Policy reduces Travelers' indemnity obligation to Hyosung. The Other Insurance provision in the Travelers Policy provides, in relevant part, that "[i]f there is other insurance covering the same loss or damage," Travelers will only pay amounts in excess of the other insurance up to its applicable limit of insurance. (Travelers Policy 37.) The Hartford Policy—as the purported Other Insurance—provides, also in relevant part, that it will pay Logipia such sums Logipia "become[s] legally obligated to pay as damages" for an otherwise covered injury or loss subject to the applicable limit of insurance. (Hartford Policy 18.)

26.    Hyosung contends that the Travelers and Hartford Policies cover separate interests and risks, so Travelers should not be permitted to rely on the Other Insurance provision in the Travelers Policy to avoid its contractual obligation to pay Hyosung for the full amount of its loss. (Hyosung's Supp. 1st Mot. 2.) Hyosung argues that "other insurance" provisions typically apply only when two or more insurance

policies cover the same risk for the benefit of the same person, but here the Travelers Policy covers Hyosung for property loss while the Hartford Policy covers Logipia (not Hyosung) if Logipia becomes "legally obligated to pay" for damage to the property of others, (Hartford Policy 18). (Hyosung's Supp. 1st Mot. 6–9 (citing Barry R. Ostrager & Thomas R. Newman, *Handbook on Insurance Coverage Disputes* § 11.01 (10th ed. 2000); Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 219:14 (3d ed. 2005)).) As such, Hyosung argues that Travelers' reliance on its Other Insurance provision is misplaced. Hartford agrees, contending that the Travelers Policy's Other Insurance provision applies only to first-party property damage policies insuring Hyosung, not to third-party liability policies like the Hartford Policy. (Hartford's Resp. 1st Mot. 5.)

27. Travelers responds by contending that both the Travelers and Hartford Policies provide coverage when Hyosung's Products suffer direct physical loss from a covered cause of loss and that the first-party property/third-party liability distinction is irrelevant. (Def. Travelers' Br. Opp'n to Pl. Hyosung's 1st Mot. Partial Summ. J. 8 [hereinafter "Travelers' Opp'n 1st Mot."], ECF No. 87.) Travelers further contends that the Other Insurance provision limits its obligation to pay Hyosung to those sums in excess[6] of Hartford's coverage. (Travelers' Opp'n 1st Mot. 7–8.)

28. As an initial matter, Travelers acknowledges that, but for the Other Insurance provision, the Travelers Policy covers Hyosung's loss. By its plain

---

[6] *See Cinoman v. Univ. of N.C.*, 234 N.C. App. 481, 485 (2014) ("An excess clause is a type of 'other insurance' clause which 'generally provides that if other . . . insurance covers the occurrence in question, the "excess" policy will provide coverage only for liability above the maximum coverage of the primary policy or policies.'" (quoting *Horace Mann Ins. Co. v. Cont'l Cas. Co.*, 54 N.C. App. 551, 555 (1981))).

language, the Travelers Policy insures Hyosung's "business personal property," including Hyosung's "Stock," in the circumstances here when a covered cause of loss results in "direct physical loss[,]" even if the loss is caused by a Windstorm. (Travelers Policy 6, 9, 11.) Travelers agrees that these coverage conditions have been met, and it is undisputed that Travelers has paid at least a portion of Hyosung's claimed losses. (Compl. ¶ 19; 1st Li Aff. Ex. 5.)

29. It is also undisputed that the Hartford Policy indemnifies Logipia for sums that it is "legally obligated to pay as damages," including those sums arising from damages to Hyosung's Products at Logipia's Warehouse. (Hartford Policy 18.) Both Policies, therefore, potentially provide insurance coverage to their insureds for damage to Hyosung's Products.

30. Travelers seeks to apply the Travelers Policy's Other Insurance provision to exclude from the amounts it owes to Hyosung all sums that Logipia is entitled to recover from Hartford for damage to Hyosung's Products. But that provision applies only if there is other insurance "covering the same loss or damage." (Travelers Policy 37.) Travelers argues that this is the case here—both the Travelers and Hartford Policies cover damage to Hyosung's Products. Therefore, Travelers contends that the Other Insurance provision excludes the amounts payable under the Hartford Policy from Travelers' obligation. (Travelers' Opp'n 1st Mot. 9–10.)

31. Hyosung argues, however, that while two policies may pay for—and in that sense "cover"—injury resulting from the same loss or damage, that does not mean that the two policies "cover" the same loss or damage within the meaning of the

Travelers Policy.  Hyosung instead contends that most courts determine if the policies at issue "cover[ ] the same loss or damage" by examining whether those policies insure the same party for the same risks.  (Pl. Hyosung's Reply Supp. Summ. J. Against Defs. Travelers and Hartford Re: Other Insurance 2–3 [hereinafter "Hyosung's Reply 1st Mot."], ECF No. 95; Travelers Policy 37.)  Relying on this authority, Hyosung argues that Travelers' Other Insurance provision does not apply to the Hartford Policy in the circumstances here.  (Hyosung's Reply 1st Mot. 3.)

32.    North Carolina's appellate courts offer little guidance concerning the "other insurance" issue before the Court.  The Fourth Circuit has observed, however, that "[i]t is generally held that in order for an other insurance clause to operate in the insurer's favor, there must be both an identity of the insured interest and an identity of risk."  *Horace Mann Ins. Co. v. Gen. Star. Nat'l Ins. Co.*, 514 F.3d 327, 334 n.3 (4th Cir. 2008) (quoting Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* §219:14 (3d ed. 2005)).  Other courts and commentators have agreed.  *See, e.g.*, *Great N. Ins. Co. v. Mount Vernon Fire Ins. Co.* (*Great N. Ins. Co.*), 92 N.Y.2d 682, 687 (1999) ("Thus, a proper interpretation of the ['other insurance' provision] requires us first to classify the types of coverage delineated in [the 'other insurance' provision] according to the interests protected under the insurance contract.  This, in turn, is accomplished by identifying the beneficiary of the insurer's duty to pay (or indemnify)."  (citing 1 Eric M. Holmes, *Appleman on Insurance* § 3.2, at 343 (2d ed. 1996))); 3 D. Leitner, R. Simpson & J. Bjorkman, *Law and Practice of Insurance Coverage Litigation* § 38.2(b), at 38-4–38-5 (2002) (noting that "other insurance" provisions apply if the policies

meet the following requirements: "1. Do the policies insure the same risk? 2. Do the policies insure the same interest? 3. Are the policies concurrent? If the answer to any of these questions is in the negative, then the 'other insurance' clause is not triggered."). The Court finds the guidance from these sources persuasive and elects to apply their analytical framework here.

33. The Court thus turns to whether the Travelers and Hartford Policies insure the same interest from the same risk and concludes that they do not. The Court agrees with the New York Court of Appeals that first-party property insurance and third-party liability insurance do not insure the same interest. As the New York high court has explained:

> Insurance contracts generally are assigned to one of two classes: either "first-party coverage" or "third-party coverage." "First-party coverage" pertains to loss or damage sustained by an insured to its property; the insured receives the proceeds when the damage occurs. In contrast, if the insurer's duty to defend and pay runs to a third-party claimant who is paid according to a judgment or settlement against the insured, then the insurance is classified as "third-party insurance." Thus, *wholly different interests are protected* by first-party coverage and third-party coverage.

*Great N. Ins. Co.*, 92 N.Y.2d at 687–88 (emphasis added) (citations omitted). The New York Court of Appeals was tasked in that case with interpreting whether a homeowner's liability policy was "other insurance" under a first-party property policy that became excess if the "other insurance" policy provided "similar coverage for 'your work.' " *Id.* at 686 (citation omitted). The court concluded that "the third-party indemnification aspect of the homeowner's coverage" distinguished it from the property policy and that "[t]o find the [homeowner's] policy 'similar' to the [property]

policy would confuse the important contractual and practical distinctions between these two coverages." *Id.* at 688.

34.  While the policy language is different in this case, the fact remains that the Travelers Policy covers Hyosung for its property losses and the Hartford Policy only provides coverage to the extent that a third-party claimant can establish liability against Logipia.  The Travelers Policy does not indemnify Logipia for its losses nor does the Hartford Policy indemnify Hyosung for its losses.  While each policy provides coverage for damage to the same Property, each policy protects a separate insured from a separate risk—Hyosung gets first-dollar protection if its property is damaged whereas Logipia gets coverage if it is legally obligated to pay damages resulting from loss to that same Property.  The Court concludes that these interests are sufficiently different to exclude the Hartford Policy from the Other Insurance provision of the Travelers Policy as a matter of North Carolina law.[7]

2.  Does the Services Agreement Displace the Travelers Policy's Terms?

35.  In the alternative, Travelers argues that the Services Agreement between Logipia and Hyosung is an indemnity agreement that requires the Travelers Policy

---

[7] In light of the Court's ruling, the Court need not address the parties' vigorous debate over whether Logipia has "become legally obligated to pay [any sums] as damages" arising from the damage to Hyosung's Products.  In that regard, Hartford argues that Logipia has not, asserting that "[a]t the moment, . . . Hartford's policy, by definition, does not yet cover Logipia for any indemnity obligation because [Logipia is] not legally obligated to pay anything." (June 24, 2021 Hr'g Tr. 31:8–31:11 [hereinafter "Tr."], ECF No. 118.)  As a result, Hartford contends that Travelers' Other Insurance provision has not been triggered and that any claim based on that provision is premature.  Travelers argues in opposition that the phrase "legally obligated to pay as damages" does not require the entry of a money judgment and instead is satisfied by Logipia's breach of its Services Agreement with Hyosung.  According to Travelers, Hartford's coverage has been triggered because Logipia became legally obligated to indemnify Hyosung "the moment the damage to the building happened" since Logipia was contractually bound to indemnify Hyosung "under the services agreement."  (Tr. 21:21–21:23.)

to be deemed excess over the Hartford Policy. (Travelers' Opp'n 1st Mot. 13–18.) The Services Agreement, however, cannot alter the unambiguous language in the Travelers Policy purporting to fully integrate the Policy:

> **5. Changes**
> This policy contains all the agreements between the Insured and the Company concerning the insurance afforded. The policy terms can be amended or waived only by written endorsement issued by the Company as part of this policy.

(Travelers Policy 34.)

36. Moreover, our Supreme Court has rejected efforts by insurers, like Travelers here, to avoid an obligation to pay its insured because of a separate contract between the insured and another party, concluding:

> The terms of another contract between different parties cannot affect the proper construction of the provisions of an insurance policy. The existence of the second contract, whether an insurance policy or otherwise, may or may not be an event which sets in operation or shuts off the liability of the insurance company under its own policy. Whether it does or does not have such effect, first, requires the construction of the policy to determine what event will set in operation or shut off the company's liability and, second, requires a construction of the other contract, or policy, to determine whether it constitutes such an event.

*Gaston Cnty. Dyeing Mach. Co. v. Northfield Ins. Co.* (*Gaston*), 351 N.C. 293, 305 (2000) (cleaned up).

37. As discussed above, the Court has concluded that the plain language of the Other Insurance provision in the Travelers Policy puts the Hartford Policy beyond its reach. Particularly in light of the Travelers Policy's integration clause, Travelers cannot rely on Hyosung's Services Agreement with Logipia—a contract to which Travelers is not even a party—to avoid its obligation to Hyosung under the Travelers

Policy's plain language. For these reasons, Travelers' reliance on the Services Agreement is unavailing.

38. Accordingly, the Court concludes, as a matter of law, that the Hartford Policy is not Other Insurance under the Travelers Policy and that Hartford should therefore be dismissed from this action.

B. Hyosung's Second Motion for Partial Summary Judgment

1. One Windstorm Deductible or Two?

39. Hyosung's Second Motion posits that Incidents 1 and 2 were part of the same "occurrence" under the Travelers Policy as a matter of law, so Hyosung is only responsible for the payment of a single $1.55 million Windstorm Deductible on its claim. Travelers contends in opposition that the two Incidents are separate and distinct "occurrences" under the Travelers Policy and that therefore Travelers properly deducted two $1.55 million Windstorm Deductibles from its payment to Hyosung for its covered losses under that Policy.

40. As with all coverage disputes, the Court's analysis must begin with the language of the Travelers Policy. *See, e.g.*, *Mazza v. Med. Mut. Ins. Co.*, 311 N.C. 621, 628 (utilizing "a strict contractual analysis focused on the language of the insurance contract to determine whether coverage exists"). Significantly, the term "occurrence" is undefined, and the Windstorm Deductible provides, in relevant part, as follows:

> **3. Application of Deductibles and Limits of Insurance – "Windstorm" or Hail Additional Provisions**
> a. When a "Windstorm" or Hail Limit of Insurance (including an entry of Included or Not Covered) or a "Windstorm" or Hail deductible is shown in the Supplemental Coverage Declarations,

such Limit of Insurance or deductible will apply to all loss or damage in any one occurrence:

> (1) Caused directly or indirectly by "Windstorm" or Hail that occurs at the locations to which the "Windstorm" or Hail Limit of Insurance or deductible applies, regardless of any other cause or event that contributes concurrently or in any sequence to the loss or damage;

(Travelers Policy 33.)

41. Hyosung argues that the Deductible's language is susceptible to just one meaning: a single Windstorm Deductible of $1.55 million must be applied because "all loss or damage" suffered in Incidents 1 and 2 was "caused directly or indirectly by [the] 'Windstorm' [occurring on 19 April 2019] . . . regardless of any other cause or event that contribute[d] concurrently or in any sequence to the loss or damage[.]" (Hyosung's Supp. 2nd Mot. 9 (quoting Travelers Policy 33) (emphasis omitted).) In particular, Hyosung contends that, regardless of whether Incident 2 was caused by rain or sprinkler activation, Incident 1 indirectly caused Incident 2 because Incident 1 resulted in the open roof and temporary repair that led to the losses suffered in Incident 2. (Hyosung's Supp. 2nd Mot. 11.) As such, Hyosung argues that only a single Windstorm Deductible applies.

42. Travelers contends in opposition that neither the undefined term "occurrence" nor the language of the Windstorm Deductible and its "anti-concurrent causation" provision[8] permits such a simplistic interpretation. Travelers argues

---

[8] The "anti-concurrent causation" provision here is the portion of paragraph 3.a(1) of the Policy that applies a Windstorm Deductible to "all loss or damage in any one occurrence . . . [c]aused directly or indirectly by [a] Windstorm[ ] . . . regardless of any other cause or event that contributes concurrently or in any sequence to the loss or damage[.]" (Travelers Policy 33.)

instead that the Court should apply the "effects" test that the United States Court of Appeals for the Second Circuit used to calculate the number of occurrences under a first-party property insurance policy in *Newmont Mines v. Hanover Ins. Co.*, 784 F.2d 127 (2d Cir. 1986) and *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props, L.L.C.*, 467 F.3d 107 (2d Cir. 2006). (Travelers' Opp'n 2nd Mot. 7–14.) Travelers contends that if the Court applies the "effects" test, it should find two occurrences under the Travelers Policy because Incidents 1 and 2 did not "constitute[ ] a single uninterrupted continuous process closely linked in time and space[.]" (Travelers' Opp'n 2nd Mot. 7–14.) In conclusion, Travelers asserts that if, as the Second Circuit held in *World Trade Ctr. Props., L.L.C.*, "the terrorist attacks of September 11, 2001— [which were] part of a coordinated attack separated by only sixteen (16) minutes— are two occurrences under the [same Travelers Policy], the losses at issue here must be two occurrences." (Travelers' Opp'n 2nd Mot. 13–14.)

43. The Court turns first to the Windstorm Deductible's use of the undefined term "occurrence." Under North Carolina's rules of contract construction,

> [W]ords which are used in common, daily, nontechnical speech, should, in the absence of evidence of a contrary intent, be given the meaning which they have for laymen in such daily usage, rather than a restrictive meaning which they may have acquired in legal usage. In the construction of contracts the purpose is to find and give effect to the intention of the contracting parties, if possible.

*N.C. Farm Bureau Mut. Ins. Co. v. Martin*, 376 N.C. 280, 287 (2020) (citation omitted). "In construing the ordinary and plain meaning of disputed terms, [the Supreme Court of North Carolina] has used 'standard, nonlegal dictionaries' as a guide." *C. D. Spangler Constr. Co.*, 326 N.C. at 152 (citation omitted).

44.    Dictionary definitions of the word "occurrence" in use at the time the Travelers Policy was issued are similar to each other.  For example, the Merriam-Webster Online Dictionary defines "occurrence" as "something that occurs" and "the action or fact of happening or occurring."   *Occurrence*, Merriam-Webster Dictionary,  https://www.merriam-webster.com/dictionary/occurrence (last visited Dec. 16, 2021).  Dictionary.com likewise defines "occurrence" to include "the action, fact or instance of occurring" or "something that happens; event; incident." *Occurrence*,  Dictionary.com,  https://www.dictionary.com/browse/occurrence (last visited Dec. 16, 2021).  The American Heritage Dictionary of the English Language is to a similar effect: "The action, fact, or instance of occurring . . . Something that takes place; an event or incident."  *Occurrence*, American Heritage Dictionary of the English  Language,  https://www.ahdictionary.com/word/search.html?q=occurrence (last visited Dec. 16, 2021).  The MacMillan Dictionary is not materially different: "something that happens, especially something unexpected and unpleasant" or "the fact of something existing or happening, especially something unexpected and unpleasant."                *Occurrence*,                Macmillan                Dictionary, https://www.macmillandictionary.com/us/dictionary/american/occurrence        (last visited Dec. 16, 2021).  What these definitions make clear—and what is important for present purposes—is that an "occurrence" in its everyday usage may include both an unexpected event or incident or an ongoing process or series of events.

45.    The North Carolina courts also provide useful guidance.   While North Carolina's appellate or federal courts do not appear to have addressed whether an

event or series of events constitutes one or more occurrences under a first-party property damage policy like the Travelers Policy here, North Carolina state and federal courts have considered the issue under a third-party liability policy. In those cases, the North Carolina courts have determined the number of occurrences under an insurance policy by applying a "cause" test rather than Travelers' preferred "effects" test. *See Gaston*, 351 N.C. at 303 ("In determining whether there was a single occurrence or multiple occurrences, we look to the cause of the property damage rather than to the effect.").

46. First, in *Christ Lutheran Church v. State Farm Fire & Cas. Co.* (*Christ Lutheran*), 122 N.C. App. 614 (1996) *aff'd per curiam*, 344 N.C. 732 (1996), the Court of Appeals considered a case in which the plaintiff's treasurer embezzled church funds over the course of several weeks by writing himself twenty-four separate checks from the church's accounts. The court held that these twenty-four instances of embezzlement comprised a single occurrence under the policy at issue because "[t]hese checks were all written in furtherance of one employee's dishonest acts. They do not constitute a new and individual act of dishonesty, as alleged by plaintiff, but are instead a continuum of wrongful actions. This was the cause of plaintiff's loss." *Id.* at 617. The court limited total recovery for the twenty-four checks to the per occurrence limit of $5,000. *Id.* at 616, 618.

47. Four years later, our Supreme Court decided *Gaston*, 351 N.C. 293 (2000). In that case, a pressure valve rupture allowed a contaminant to leak over the course of two months into nearly sixty tons of contrast media dye, a chemical used in medical

imaging. *Id.* at 295. The leak started during one policy period but was not discovered until a later policy period. *Id.* Critical to a determination of coverage, therefore, was whether these facts presented one or more occurrences and when the occurrence or occurrences occurred. *Id.* at 299.

48. In interpreting the term "occurrence," which was defined in the policy as an "accident, including continuous or repeated exposure to substantially the same general harmful conditions," *id.* at 300, the Supreme Court concluded first as follows:

> The sudden, unexpected leakage from the pressure vessel, causing release of a contaminant into [the] dye product, certainly comes within the ordinary meaning of the term "accident." Further, there is no dispute that all the damage occurred as a result of exposure to the same harmful condition -- continued leakage of the contaminant into the dye product. Thus, under the plain language of the insurance policies, the property damage was caused by an occurrence, and property damage occurred on 21 June 1992 when the pressure vessel ruptured. Stated differently, the "injury-in-fact" in this case can be determined with certainty because the cause of the property damage occurred and property damage resulted on 21 June 1992. Therefore, the 1 July 1991 to 1 July 1992 policy period is triggered, even though the contamination continued until discovery of the leak on 31 August 1992.

*Id.* at 302.

49. Having reached that conclusion, the Supreme Court then reasoned:

> In this case, the rupture of the pressure vessel caused all of the ensuing property damage, even though the damage continued over time, contaminating multiple dye lots and extending over two policy periods. Therefore, when, as in this case, the accident that causes an injury-in-fact occurs on a date certain and all subsequent damages flow from the single event, there is but a single occurrence; and only policies on the risk on the date of the injury-causing event are triggered. We believe this interpretation is the most faithful to the language and terms of the insurance policy.

*Id.* at 303–04.  Thus, like the Court of Appeals in *Christ Lutheran*, the Supreme Court in *Gaston* found multiple injury-causing events over a relatively lengthy period of time to constitute a single occurrence under the policy at issue.  *Id.* at 304.

50.     Similarly, in *W. World Ins. Co. v. Wilkie* (*Wilkie*), No. 5:06-CV-64-H(3), 2007 U.S. Dist. LEXIS 81677 (E.D.N.C. Nov. 1, 2007), the United States District Court for the Eastern District of North Carolina applied North Carolina law to determine that children's exposure to *E. coli* over ten days at a state fair petting zoo constituted a single occurrence under the liability policy at issue.  The court cited the "cause" test from *Gaston* and *Christ Lutheran* in concluding that, "[t]he presence of *E.Coli* [sic] at the petting zoo is the general harmful condition to which defendants were exposed, and the cause of this condition was [the defendant's] ongoing negligence."  *Id.* at *19. Therefore, the court concluded that there was only one occurrence.  *Id.*

51.     Finally, in *Mitsui Sumitomo Ins. Co. of Am. v. Duke Univ. Health Sys.*, 509 F. App'x 233, 241 (4th Cir. 2013), the Fourth Circuit relied upon *Gaston*'s "cause" test to affirm a district court's conclusion that an elevator company's negligence in failing to dispose of hydraulic fluid used in hospital renovations that was later mistakenly used to wash surgical instruments and thereby caused injury to patients was a single occurrence under the policy at issue.

52.     While all of these cases construed policies defining the term "occurrence" and none involved first-party property coverage, the "occurrence" definitions in the policies were consistent with that term's common usage.[9]  Additionally, unlike with

---

[9] *See, e.g.*, *Christ Lutheran*, 122 N.C. App. at 616 (defining "occurrence" as "[a]ll loss involving a single act, or *series of related acts*, caused by one or more persons." (emphasis added));

the Travelers Policy's Other Insurance provision, the Court discerns no reason why the test to determine an "occurrence" should vary depending on whether a policy covers insureds against first-party property damage rather than against third-party liability. Consequently, the Court concludes that these decisions provide determinative guidance here.

53. The Court finds further support for its conclusion from courts in other jurisdictions which have applied the "cause" test, rather than the "effects" test, to determine the number of occurrences under a first-party property damage insurance policy like the Travelers Policy here. *See, e.g.*, *U.E. Tex. One-Barrington, Ltd. v. Gen. Star Indem. Co.*, 332 F.3d 274, 277 (5th Cir. 2003) (under a property policy, "the proper focus in interpreting 'occurrence' is on the events that cause the injuries and give rise to the insured's liability, rather than on the number of injurious effects." (quoting *Ran-Nan Inc. v. Gen. Accident Ins. Co. of Am.*, 252 F.3d 738, 740 (5th Cir. 2001))); *Basler Turbo Conversions LLC v. HCC Ins. Co.*, 601 F. Supp. 2d 1082, 1084–85, 1089–90 (E.D. Wis. 2009) (applying cause test to determine the number of occurrences under a property policy). Accordingly, based on the above, the Court concludes that, if faced with the issue, our Supreme Court would apply *Gaston*'s

---

*Gaston*, 351 N.C. at 295–96, 301 (an occurrence-based comprehensive general liability policy defining occurrence as "[w]ith respect to bodily injury or property damage[ ]: an accident, including continuous or repeated exposure to substantially the same harmful conditions . . . ."); *Wilkie*, 2007 U.S. Dist. LEXIS 81677 at *8 (an occurrence-based policy defining "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions"); *Mitsui Sumitomo*, 509 Fed. App'x. at 236 (defining "occurrence" as "an accident, including the continuous repeated exposure to substantially the same harmful condition").

"cause" test, rather than the Second Circuit's "effects" test, to determine if one or more occurrences have taken place under the Travelers Policy.

54.    The Court will thus apply *Gaston*'s "cause" test to the undisputed facts here.[10]   As noted above, the *Gaston* Court concluded that where "all subsequent damages flow from [a] single event, there is but a single occurrence[.]"  *Gaston*, 351 N.C. at 304.  Here, it is undisputed that Incident 1 caused substantial damage to the Warehouse's roof, which necessitated the repairs that later failed in Incident 2, causing further damage to Hyosung's Products.  Like the valve rupture in *Gaston* that allowed contaminants to continually seep into the media contrast dye, the initial Windstorm exposed Hyosung's Products to the elements.  The attempted repair not only caused further water damage by apparently activating the Warehouse's sprinkler system, but it also failed to protect Hyosung's Products from further rain damage.[11]   In short, like *Gaston*'s pressure vessel rupture, the hole in the

---

[10] Despite the Court's conclusion that *Gaston*'s "cause" test should be applied, Travelers argues that *Gaston*'s test must be displaced by operation of the Windstorm Deductible's anti-concurrent causation language. (Travelers' Opp'n 2nd Mot. 17 n.6.)  The Court disagrees.  By the Windstorm Deductible's plain terms, the anti-concurrent causation language is relevant only if Hyosung suffers "loss or damage in any one occurrence[.]"  (Travelers Policy 33.)  The anti-concurrent causation language, therefore, does not bear on the determination of the number of occurrences under the Windstorm Deductible and becomes relevant only after an occurrence has been established.

[11] Hyosung's Technical Manager explained in an April 26 email to the Travelers adjuster that:

> To follow up on my voicemail earlier, with the *rain this morning* the Savannah Warehouse has become partially flooded – temporary curtains by Duke realty and our tarps + floor damns [sic] were not effective in *stopping the water entering the building from the open roof* to moving outward and potentially effecting [sic] additional material.

(Travelers' Opp'n 2nd Mot. Ex. 3 (emphasis added).)

Warehouse's roof that allowed wind and rain to damage Hyosung's Products during Incident 1 is the same hole in the Warehouse's roof that allowed wind[12] and rain to damage Hyosung's Products in Incident 2.

55. The fact that Incidents 1 and 2 took place one week apart is of no consequence since both Incidents were caused by the April 19 Windstorm. *See Appalachian Ins. Co. v. Liberty Mut. Ins. Co.*, 676 F.2d 56, 61 (3d Cir. 1982) ("The fact that there were multiple injuries and that they were of different magnitudes and that injuries extended over a period of time does not alter our conclusion that there was a single occurrence. As long as the injuries stem from one proximate cause there is a single occurrence."); *Gaston*, 351 N.C. at 298, 304 (affirming the trial court's finding of a single occurrence even though the leak repeatedly contaminated medical dye for over two months); *Liberty Mut. Ins. Co. v. Treesdale, Inc.*, 418 F.3d 330, 339 (3d Cir. 2005) (affirming the finding that multiple incidents of asbestos exposure over a ten-year period were a single occurrence). Accordingly, the Court concludes, for the reasons set forth above, that a single Windstorm Deductible applies to Incidents 1 and 2.

2. A Second Windstorm?

56. As noted above, a "Windstorm" is defined in the Travelers Policy as "a storm with wind or wind gusts, with or without, and regardless of the amount of, precipitation." (Travelers Policy 47.) Travelers contends in the alternative that

---

[12] Travelers posits, without evidence, that the sprinkler heads were likely activated when the wind lifted the repair sheeting into the air. (Travelers' Opp'n 2nd Mot. 18–19.) Even if true, wind was only able to enter the Warehouse because the April 19 Windstorm removed vast portions of the roof.

Incident 2 resulted from a second Windstorm on April 26, requiring application of a second Windstorm Deductible. For its support, Travelers first points to a Project Manager Report between Duke Realty and SRM on April 25 resolving to install plastic sheeting "to minimize additional damage due to the potential rain moving into the area on Friday [April 26]." (Travelers' Opp'n 2nd Mot. Ex. 2, ECF No. 103.2.) This report, however, does not permit a factfinder to conclude that a Windstorm occurred on April 26. Not only does the communication predict rain, not a Windstorm, but the communication's forecast of rain, without more, does not provide evidence that rain, much less a Windstorm, in fact occurred.

57. Travelers next points to the April 26 email from Hyosung's technical manager discussed in footnote 11 above. (Travelers' Opp'n 2nd Mot. Ex. 3.) While this communication may provide evidence that it rained at the Warehouse on April 26, it cannot, without more, provide a basis for a factfinder's conclusion that a Windstorm occurred that day.

58. Finally, Travelers relies on an affidavit from a Travelers adjuster who was not present at the Warehouse on the day of Incident 2 but who inspected and photographed the Warehouse three days later. The adjuster claimed that he "discovered that the sprinkler system did not engage due to damage while installing the tarps and sheeting. Rather, it occurred when a thunderstorm came through the area which caused the sheeting to whip around in the winds." (Travelers' Opp'n 2nd Mot. Ex. 1, ¶ 11, ECF No. 103.1.) The adjuster's claim that a thunderstorm caused the damage suffered in Incident 2 is offered without supporting evidence or analysis,

however, and, as such, constitutes impermissible speculation and conjecture which must be disregarded as inadmissible hearsay. *See Gilreath v. N.C. HHS*, 177 N.C. App. 499, 503 (2006) ("Affidavits supporting or opposing a motion for summary judgment 'shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.' " (quoting N.C. Gen. Stat. § 1A-1, Rule 56(e) (2005))); *see also Moore v. Coachmen Indus. Inc.*, 129 N.C. App. 389, 394 (1998) ("Hearsay matters included in affidavits should not be considered by a trial court in entertaining a party's motion for summary judgment.").

59. Accordingly, for the reasons set forth above, Travelers has failed to offer evidence, whether considered separately or collectively, from which a reasonable factfinder could conclude that there was a second Windstorm on April 26. Travelers' alternative contention therefore is without merit.

IV.

CONCLUSION

60. **WHEREFORE**, for the reasons set forth above, the Court hereby **GRANTS** both of Hyosung's Motions for Partial Summary Judgment and:

    a. **ENTERS JUDGMENT DECLARING** that the Hartford Policy does not constitute Other Insurance under the terms of the Travelers Policy and therefore that Hyosung's claims against Hartford in this action are hereby **DISMISSED**;

b. **ENTERS JUDGMENT DECLARING** that all loss or damage arising from Incident 1 and Incident 2 constituted a single "occurrence" under the Travelers Policy;

c. **ENTERS JUDGMENT DECLARING** that a single Windstorm Deductible applies to all loss or damage arising from Incident 1 and Incident 2 under the Travelers Policy;

d. **ENTERS JUDGMENT ORDERING** Travelers to pay to Hyosung the $1.55 million that Travelers deducted from its payment to Hyosung for Incident 2 under the Travelers Policy.

**SO ORDERED**, this the 16th day of December, 2021.

/s/ Louis A. Bledsoe, III
Louis A. Bledsoe, III
Chief Business Court Judge